# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **DAVID MEYERS,** | ) | **Civil Action Nos. 7:18cv00485,** |
| **Plaintiff,** | ) | **7:19cv00003** |
| | ) | |
| **v.** | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| **WARDEN JEFFREY KISER, et al.,** | ) | **By:  Pamela Meade Sargent** |
| **Defendants.** | ) | **United States Magistrate Judge** |

David Meyers, ("Meyers"), a Virginia Department of Corrections, ("VDOC"), inmate proceeding pro se, brings these civil rights actions against numerous VDOC employees under 42 U.S.C. § 1983.  Because at least three of Meyers's previous complaints have been dismissed with prejudice for failing to state a claim upon which relief may be granted under 28 U.S.C. § 1915A(b)(1), Meyers may not proceed with these actions unless he pays the full filing fee upfront or shows that he is under "imminent danger of serious physical injury." 28 U.S.C.A. § 1915(g) (West 2006). These matters are before the undersigned magistrate judge by referral, pursuant to 28 U.S.C. § 636(b)(1)(B), to determine if Meyers was under imminent danger of serious physical injury at the time he filed these actions. *See Martin v. Shelton*, 319 F.3d 1048, 1050 (8th Cir. 2003).

An evidentiary hearing was conducted on December 27, 2018, in Case No. 7:18cv00485. By Report and Recommendation entered January 3, 2019, the undersigned recommended that the court find that Meyers was not under imminent danger of serious physical injury at the time of the filing of his complaints in Case

No. 7:18cv00485.[1] On January 9, 2019, the court received a letter from inmate witness Vinnie Vincent Chand, claiming that he had given false testimony at the December 27, 2018, hearing. (Docket Item No. 47.) As a result, the undersigned's January 3, 2019, Report and Recommendation was vacated, and Case No. 7:18cv00485 was recommitted to the undersigned for further determination. (Docket Item No. 52.) Also, Case No. 7:19cv00003 was filed and referred to the undersigned to conduct a hearing to determine if Meyers was under "imminent danger of serious physical injury" at the time of the filing of his complaint in that case. Another evidentiary hearing was held before the undersigned on February 21-22, 2019, in both cases.[2] The undersigned now submits the following report recommending that the court find that Meyers was not under imminent danger of serious physical injury at the time that he filed these actions.

## I. Facts

In Case No. 7:18cv00485, three separate civil rights actions have been consolidated by orders of the court, (Docket Item Nos. 7, 21). Meyers testified that he placed the Complaint, received and filed by the court on October 3, 2018, (Docket Item No. 1), in the mail on September 29, 2018.  He testified that he placed the Complaint, received and filed by the court on October 15, 2018, (Docket Item No. 8), in the mail on October 10, 2018. He testified that he placed the Complaint, received and filed by the court on November 9, 2018, (Docket Item

---

[1] By orders entered November 28, 2018, and December 18, 2018, three of Meyers's cases, Civil Action No. 7:18cv00556, Civil Action No. 7:18cv00502 and Civil Action No. 7:18cv00485, were consolidated.  (Docket Item Nos. 7, 21.)

[2] While these cases have not been formally consolidated, they were heard together by the undersigned on February 21-22. All references to the docket entries for the exhibits are to Civil Action No. 7:18cv00485.

No. 20), in the mail on October 25, 2018. Meyers testified that, when he placed each of these complaints in the prison's outgoing mail to the court, he was housed in the B4 housing unit at Red Onion State Prison, ("Red Onion"), in cell 410. Meyers said that he was moved to cell B-410 on September 26, 2018, and he remained housed in this cell until he was transferred to Wallens Ridge State Prison, ("Wallens Ridge"), on November 20, 2018.

At the December hearing, Meyers testified that, prior to August 29, 2018, he was housed in the Protective Custody Unit in the C6 housing unit at Red Onion. He said that, on August 29, 2018, Unit Manager Collins moved him to administrative segregation in a single cell in the D3 housing unit. Meyers said that he was moved from the Protective Custody Unit because he had reported that another inmate housed in the unit, Jamal Thompson,[3] had masturbated in front of him and had threatened him. Meyers stated that, for the first 14 days that he was held in the D3 housing unit, he was left wearing his distinctive yellow Protective Custody Unit uniform. Meyers said that this uniform let the other inmates know that he had been in the Protective Custody Unit, and many of the inmates threatened him or harassed him because of this. He testified that four or five days after he was moved to cell B-410, inmate Leon Anderson, who was housed in cell B-407, began making death threats against him. Meyers did not, however, state the circumstances surrounding any of these threats, except to say that Anderson was locked in his cell and Meyers was locked in his cell when these threats were made.

---

[3] Meyers testified at the evidentiary hearing that the inmate he refers to as both "Jamal" and "Jamar" Thompson is the same inmate.

Meyers testified that, while held in the D3 and the B4 housing units at Red Onion, and since being moved to Wallens Ridge, he was in a single cell for 24 hours a day with no direct contact with any other inmates or correctional officers. At different times in his testimony, Meyers stated that he never came out of cell B-410 from September 26 until his transfer on November 20, 2018. He said that he was not offered a shower or recreation out of the cell during that entire time. In fact, at one point, Meyers stated, "The only reason I am alive is that I didn't come out of that cell." At other points in his testimony, Meyers stated that certain officers came to his cell and pushed him in his wheelchair to attend classification and other hearings outside of his cell.

Meyers testified that he was assaulted by Correctional Officer P. Deel three times while he was housed in cell B-410. He said that, on September 28, 2018, Deel told him, "I am going to kill you, you PC [protective custody] rat child molester." He said that Deel then threw two bags of milk and a bag of juice through the cell door tray slot, striking him in the testicles and leg. Meyers said that, Deel assaulted him again on September 30, 2018, when Deel threw a meal tray through the cell door tray slot. Meyers said that the plastic tray struck him in his legs, and the food struck him on his chest. Meyers said that Deel assaulted him a third time on October 4, 2018, when Deel again threw two milk bags through the tray slot at breakfast time striking him in the legs. Meyers testified that the containers of milk that Deel threw at him were small plastic single serving bags. Nonetheless, Meyer stated that he was "seriously injured" by the milk container that struck him in his testicles.

Meyers testified that he suffered from a host of chronic medical conditions. Meyers said that he had been shot nine times in his life, had a bullet lodged in his heart and had suffered severe back and neck injuries in a motor vehicle accident prior to his current incarceration. Meyers said that he could no longer stand unassisted and was confined to a wheelchair. He said he had totally lost the use of his legs since he had been housed at Red Onion. Meyers also stated that he was visually impaired because of a previous stab injury to an eye and chronic eye disease. Meyers also testified that he had stomach cancer. When asked when he had been diagnosed with stomach cancer, Meyers admitted that no doctor had diagnosed him as suffering from cancer, but he knew that he had cancer because he was coughing up blood and passing blood in his stools.

Meyers claimed that he repeatedly had asked for, and was denied, medical treatment while he was housed in cell B-410. Meyers did not, however, testify regarding any specific request he made on any specific date. He did offer Plaintiff's Exhibit No. 3 into evidence, which he said documented his requests for medical treatment. Several of the documents contained in Plaintiff's Exhibit No. 3 do not pertain to the relevant period of time.

Plaintiff's Exhibit No. 3 contains an Offender Request form from Meyers dated October 29, 2018. (Docket Item No. 31-3 at 4.) On this form, Meyers wrote that he needed "pain medication for gunshot, car [accident] injuries[,] arthritis and ribs[,] shoulder[,] testicles and head injuries."  Meyers also wrote:

> … I seen Nurse Ball[,] the nurse practitioner[,] on Thursday 10-25-2018 for ribs, shoulder, head, chest, hand, testicles injuries. I did not receive the 800 mg Motrin with my Tylenol this morning. If you

-5-

can't prescribe Motrin to me then prescribe Mobic because I'm in severe pain from my above recent injuries and I'm in excruciating pain from my 9 gun shot wound injuries. Bullet lodged in my chest and I'm in pain from my car accident injuries to my neck, back, hip, right knee. I also requested a muscle relaxer for my back spasm and Nurse Ball didn't refill my Vitamin C medication that expired. Please remind her to prescribe me Mobic, a muscle relaxer, renew my vitamin C order that ran out, and I need my [hemorrhoid] ointment out of my storage property and Pepsic medication.

It appears that Nurse Yates responded on November 3, 2018, and stated:

Mr. Meyers you are on Tylenol 500 mg 2 tabs twice a day & your Motrin 200 mg 2 tabs twice a day ran out 10/17/18 per MD order. If you are continuing to have issues please sign up to see the doctor.

Despite this specific request from Meyers to receive Motrin, he testified at his evidentiary hearing that he was allergic to Motrin.

This exhibit also contains an Offender Request form from Meyers dated November 5, 2018. (Docket Item No. 31-3 at 3.) This form stated that Meyers was requesting "to be signed up to see the Doctor…." It also stated:

I am requesting to be signed up to see the Doctor per RN Yates response to my 10/29/18 and 10/30/2018 Request Form to Nurse Ball who examined me for Dr. Fox and said she would renew my Mobic, muscle relaxer for back spasms, and renew my vitamin D medication and have property department Officer Owens bring me my [hemorrhoid] ointment from my storage property. I was seen by Nurse Yates on 10/12/2018 for my ribs, head, shoulders, chest, legs, and testicles injuries, and nurse should have referred me to see Dr. Fox. Nurse Ball examined me on 10/26/2018 for the above injuries and stated she would renew them and that she was examining for Dr. Fox.

-6-

Nurse Yates is now stating to re-request to sign up to see doctor so I am requesting to be signed up to see the doctor.

S. Anderson, R.N., responded on November 8, 2018, and stated:

Can you be more specific on what you need to see the doctor for this time. She addressed all the above stated issues & renewed Tylenol & Pepcid on 10/25/18. You also denied testicular problems @ that time. You have already had xrays of ribs & hand – results are pending.

This exhibit also contains an Offender Request form from Meyers dated November 9, 2018. (Docket Item No. 31-3 at 5.) This form stated that Meyers was "requesting to see the doctor." It also stated:

RN S. Anderson on 10/25/2018 I reported medical complaints of my testicles injury and ribs, head, shoulders, chest, legs injur[ies]. Nurse Ball stated that she was going to have my urine tested for the pain in my testicles from my testicles injury on 09/28/18, and have x rays for my ribs, shoulders, and hand. At no time did I deny testicles problems or testicle injuries or any of the above injuries. Nurse Ball stated she would have my urine tested for my testicles injury and pain urinating. She also stated she would renew my Mobic, my muscle relaxer, and my vitamin D medications. I want to see the doctor because I am having severe pain in my testicles, ribs, head, chest, hand and legs, and I'm having back spasms and I need my Mobic, muscle relaxer and vitamin D medications and [hemorrhoid] ointment, and have my urine tested for my testicles injury.

Nurse Yates responded on November 18, 2018:

Per D. Ball's FNP note you denied urinary problems & denied testicular/penis problem. You received an x ray on 11/2/18.

-7-

When asked what danger he was under at the time of filing of the complaints at issue in Case No. 7:18cv00485, Meyers responded that inmates were making death threats against him, Officer Deel had assaulted him, he was not receiving any mental health treatment, and his requests for medical services were being denied. Meyers testified that his life was in danger at Wallens Ridge. Nonetheless, Meyers admitted that, upon his transfer to Wallens Ridge, he remained housed in a segregation cell. Meyers said that VDOC employees were trying to persuade him to complete the Step-Down Program so that he could be moved from segregation to general population, where he would be assaulted or killed. Meyers testified that he could not go to general population and that he could not sit in a segregation cell 24 hours a day.

Meyers called inmate witness Adib Eddie Ramez Makdessi to testify. Makdessi stated that he was housed in the Protective Custody Unit at Red Onion with Meyers from 2017 until Meyers was moved from the Unit in August 2018. Makdessi testified that he had never heard any Red Onion employee make any threat toward Meyers. Makdessi admitted that he had no knowledge of the conditions of Meyers's confinement after he was moved from the Protective Custody Unit in August. Makdessi said that he did witness Jamal Thompson threaten Meyers on the outside recreation yard on August 25, 2018. While he did not remember Thompson's exact words, Makdessi said that he said something about getting his hands on Meyers. Makdessi also testified that it was difficult on occasion to receive Informal Complaint or Grievance forms from Red Onion employees. He also said that many of the Informal Complaint or Grievance forms he had filed went "missing."

Makdessi testified that, he had seen correctional officers charge Meyers with disciplinary offenses, but he did not know whether any of these charges were warranted or not. Makdessi said that he had not witnessed any Red Onion employees targeting Meyers for retaliation. Makdessi said that he did witness officers picking Meyers up and placing him on a metal detecting scanner chair in July 2018. He said that he also witnessed officers telling Meyers to get up out of his wheelchair and walk through a metal detector in November 2017. Makdessi said that he was aware that another inmate, Lionel Carter, worked as Meyers's caregiver when Meyers was housed in the Protective Custody Unit.

Red Onion inmate Randy Taylor testified that no Red Onion employee had retaliated against him since he had testified for Meyers at an August 2018 hearing. Taylor also testified that Carter assisted Meyers while Meyers was housed in the Protective Custody Unit.

Meyers also called Lionel Carter to testify. Carter stated that he worked as a caregiver to Meyers for more than a year while Meyers was housed in the Protective Custody Unit at Red Onion. As caregiver, Carter stated that he assisted Meyers with showers and pushed his wheelchair and helped Meyers get around. Carter said that he did not perform any services for Meyers after Meyers was moved from the Protective Custody Unit. After that, Carter stated that he did not want to testify any further, and Meyers did not ask Carter any questions.

Meyers also called Red Onion inmate Vincent "Vinnie" Chand to testify. Chand testified that he witnessed other Protective Custody inmates Thompson, Riding and Thomas threaten Meyers on several occasions. Chand said that he did

not witness any correctional officers dragging Meyers from his wheelchair during a shakedown on July 19, 2018. He also testified that he had never heard any Red Onion employee threaten Meyers. Chand said that he did not know why Meyers was removed from the Protective Custody Unit. He said that inmate Jamal Thompson was moved from the Protective Custody Unit because Thompson requested to be moved from the Unit.

Chand said that he had written Warden Kiser on three previous occasions trying to resolve problems. He said that Kiser had never sent him any written response, but, on one occasion, Kiser had sent Investigator Fannin to speak with him. Chand said that he did not know how many inmates in the Protective Custody Unit were gang members. He did admit that several inmates had told him they were gang members. He also testified that nurses did not make rounds in the Protective Custody Unit, but would come to examine an inmate if he made a sick call request.

Chand testified that Red Onion inmates had to request Informal Complaint or Grievance forms from correctional sergeants or lieutenants. He said that some officers were more prompt than others in obtaining these forms for him. Chand also said that he had filed Informal Complaint or Grievance forms that had not been received. He also said that he had experienced a hard time getting Grievances processed because they were often rejected at intake for raising more than one issue. Chand said that he had asked Unit Manager Collins for Informal Complaint or Grievance forms in the past and that Collins had never seemed to be disgruntled or angry over these requests. Chand said that any time he has had an issue, Collins had attempted to help him resolve it.

On cross-examination, Chand admitted that Meyers had spoken to him about testifying for him on four or five occasions while Meyers was still housed in the Protective Custody Unit. Chand said that he found a couple of these conversations "troubling." Chand said that these conversations were troubling because Meyers wanted him to testify to or to write witness statements containing false information. In particular, Chand said that Meyers wanted him to provide a witness statement saying that certain events had occurred that Chand had never witnessed. Chand said that Meyers had requested that he write a false affidavit against defendants Swiney, Collins, Fannin, Bentley and several other prison officials.

Chand testified that Meyers told him, "If you do these things for me, I will look out for you." Chand said that Meyers told him that he was "trying to get a lot of money from this lawsuit." Chand said that Meyers told him that he would split any money he got with him. Chand also testified that Meyers told him that he was pursuing litigation against the defendants because he wanted to be placed at a lower security prison where he could smoke marijuana and obtain a cell phone. He said that Meyers told him that he liked "messing around" with prison employees and that he wanted them to "bend to his will while he was incarcerated." Chand said that he told Meyers that "he was playing a dangerous game." He said Meyers responded, "I have nothing to lose."

Chand said that he previously had given Meyers a letter that he had written to VDOC Director Harold Clarke outlining numerous complaints that Chand had against Red Onion employees and procedures. He said that after he allowed Meyers to read this letter, Meyers began claiming that he was having some of the same problems. Chand said that he thought that Meyers may suffer from some type

of mental illness. He said that he had never offered any false testimony or provided any false affidavits for Meyers.

Defendant Walter Swiney testified that he had been the Unit Manager over the D Building at Red Onion since 2015. Swiney said that he had seen Meyers and spoken to him on only one occasion since Meyers was moved to the B Building at Red Onion. Swiney said that, on this occasion, he made rounds through the B Building, passed by Meyers's cell door, said "how are you?" to Meyers and kept walking.

Swiney said that Unit Manager Collins moved Meyers from the Protective Custody Unit at Red Onion to a cell in the D Building for Meyers's safety, after Meyers reported to him that inmate Thompson had threatened Meyers and masturbated in front of Meyers in August 2018. Swiney said that Meyers was held in administrative segregation status while his allegations against Thompson were investigated. He admitted that Thompson also was held in a separate segregation cell in the D Building next to Meyers's cell for a period of time. Swiney said that Investigator Fannin investigated Meyers's allegations against Thompson and deemed the allegations unfounded. As a result, he said that Meyers was going to be moved back to the Protective Custody Unit. Swiney said that, when Officer Baker went to Meyers's cell and told him to pack his property to return to the Protective Custody Unit, Meyers refused, and Baker charged Meyers with refusing an order, a 201B disciplinary offense. Swiney denied that he instructed Baker to falsely charge Meyers with refusing an order.

 Swiney said that, on September 25, 2018, an Institutional Classification
Hearing was held at Meyers's cell door. As a result, Meyers was reclassified from
a security level "P" to a security level 5. Swiney admitted that Meyers did not
complete any form stating that he was refusing to return to the Protective Custody
Unit. Swiney said that Meyers was given notice of his upcoming ICA hearing, but
he refused to sign the notice form. This form was admitted into evidence as
Defense Exhibit No. 1, (Docket Item No. 31-10). Meyers then was transferred to
the B Building at Red Onion on September 26, 2018. Swiney said that Meyers was
kept in the B Building, where he was held as a segregation inmate, with no other
inmates having any access to Meyers, until he was transferred to Wallens Ridge.

 Swiney testified that he acted as the Institutional Classification Authority
who recommended that Meyers be reclassified as a security level 5. He said that he
also recommended that Meyers be transferred to Wallens Ridge. He said that his
decision was documented on the Institutional Classification Hearing form admitted
as Defense Exhibit No. 2, (Docket Item No. 31-11). He said that the decision to
transfer Meyers was approved by the Central Classification Service. He said that
since Meyers had been transferred to Wallens Ridge, he and all other Red Onion
employees had no further authority over or contact with Meyers.

 Swiney stated that, to be classified as a security level 5, an inmate must have
at least 32 or more points against him. Swiney said that inmates are awarded
various points based on the severity of their criminal convictions, the length of
their incarceration sentence, their age and any disciplinary offenses they had
committed. Swiney said that Meyers had at least eight institutional infractions
against him that raised his security level to a 5. Swiney said that Defense Exhibit

-13-

No. 8, (Docket Item No. 31-17), is a list of the Offender Disciplinary Actions taken against Meyers while in VDOC custody. Under the Hearing Disposition section of the Institutional Classification Hearing form it states:

> The ICA recommends: Security Level change to 5 – Maximum
> Rationale: ICA recommends that offender Meyers'[s] security level be changed from level "P" to level 5. Offender Meyers is currently listed as Medical Code E and had previously been housed in Protective Custody and now refuses to leave segregation. Offender Meyers stated he had [enemies] in the housing unit and offender was provided (8) Enemy Summary forms. Once he completed the forms, an investigation was completed by the institutional investigator and there was no evidence to support his claims of any threats. While being housed at ROSP he has received 8 charges including a 201B, refusing to live in Protective Custody.

(Docket Item No. 31-11). This form indicates that Swiney's decision was upheld on Administrative Review by Arvil Gallihar and approved at Central Classification Services by Gail R. Jones.

The Enemy Summary forms submitted by Meyers were admitted into evidence as Defense Exhibit Nos. 3-7, (Docket Item Nos. 31-12 to -16). Swiney testified that he did not know who had provided these forms to Meyers, but they were completed by Meyers and dated September 13, 2018. Swiney said that Fannin had investigated each of the Enemy Summary forms Meyers submitted and had found no reason to place the inmates listed on Meyers's enemies list. Swiney said that Warden Kiser had approved this decision.

Subsequent to the December hearing, Meyers submitted a number of additional documents for the court's consideration, (Docket Item No. 43). These

documents include at least two documents that the undersigned refused to admit into evidence at the December 27, 2018, hearing. (Docket Item Nos. 43-1, 43-3.) These documents will not be considered. These documents also include a Virginia State Bar complaint form, dated December 28, 2018, on which Meyers complained that defense counsel, Charisse Mullen, had assisted defendants J. Kiser, W. Swiney, J. Fannin, J. Bentley, K. Counts and Unit Manager Collins to make threats and promises to inmate witness Chand to give false testimony at the December 27, 2018, hearing. (Docket Item No. 43-11.). On this complaint form Meyers wrote:

> Attorney Charisse Mullen did assist Defendant Walter R. Swiney and Defendants in Civil Action 7:18cv485 to commit further crimes on me. On 12/28/2018 Defendant W. Swiney had WRSP Unit Manager Reynolds come to my cell D2-210 and deliver to me Defendant W. Swiney and WRSP employees death threats to me that W. Swiney and the WRSP employees would kill me. Unit Manager Reynolds did come to my cell door and deliver Swiney[']s death threat and the WRSP employees death threats to me face to face at Wallens Ridge State Prison on 12/28/2018. Attorney Charisse Mullen and the defendants had Inmate Vinnie Chand give men of straw – straw man false testimony on me that I asked him to file a false statement on Defendant Swiney and Defendants to be moved to a low security prison to smoke marijuana and have a cell phone and promised to pay him. I never made any of these statements to Chand and exhibits I sent to the court show Chand will give false testimony on inmates for the defendants.

(Docket Item No. 43-11.)

Many of the other documents submitted appear to contain no information relevant to the issue currently before the court. These documents include:

1.  An Informal Complaint filed by Meyers on July 30, 2018, against Hearing Officer M. Counts regarding the handling of evidence for disciplinary hearings. (Docket Item No. 43-2.);

2.  An Offender Request form from Meyers, dated May 13, 2018, claiming that inmate Vinnie Chand was housed in cell D-119 and throwing urine mixed with water through the vent that was coming into Meyers's cell. (Docket Item No. 43-4.);

3.  An April 7, 2018, letter from Chand, complaining that he had been assaulted by other inmates in the Protective Custody Unit at Red Onion. (Docket Item No. 43-5.);

4.  An August 15, 2018, Affidavit from Chand, stating that he had witnessed inmate Thomas make threats to physically harm Meyers. (Docket Item No. 43-6.);

5.  A page from a June 7, 2012, psychiatric report from Dr. David Albright, M.D., regarding Meyers. (Docket Item No. 43-7.);

6.  An April 22, 2016, letter from Sherida Davis-Bryan, Correspondence Unit Manager with the VDOC. (Docket Item No. 43-8.);

7.  An undated note Meyers claimed he received from Chand on July 28, 2018. (Docket Item No. 43-9.);

8.  A list of Arguments and Questions that Meyers claims he received from Chand on August 23, 2018. (Docket Item No. 43-10.);

9.  An Offender Request form from Meyers, dated August 26, 2018, making a PREA sexual abuse complaint against inmate Jamar Thompson, claiming that Thompson was in his cell door window standing in a chair on August 26 between the hours for 4-5 p.m. stroking his penis and masturbating in front of Meyers and inmate Randy Taylor, who were talking in front of Meyers's cell door. (Docket Item No. 43-12.);

10. An Offender Request form from Meyers, dated July 16, 2018, complaining that Officer Rose was tampering with his ability to call witnesses for a disciplinary offense hearing. (Docket Item No. 43-13.);

11. An Offender Request form from Meyers, dated July 16, 2018, complaining to the commissary manager that she was attempting to murder Meyers by selling him stale, molded food items, including honey buns, and by the unsanitary handling of

food items by leaving commissary items on the prison floor. (Docket Item No. 43-14.);

12.    An August 12, 2018, letter from Meyers to Marcus Elam, Western Regional Administrator, Western Regional Office of VDOC, about refusal to process his grievances and appeals, with an attached Regular Grievance from Meyers, complaining about failure to process informal complaints and grievances and improper monies being taken from his inmate account by the librarian. (Docket Item No. 43-15.);

13.    A Regular Grievance from Meyers, dated April 27, 2017, complaining that Assistant Attorney General Mary Grace Miller had posted sealed court documents on the CORIS system for review by VDOC employees. (Docket Item No. 43-16.);

14.    A March 29, 2017, Level II Grievance Response regarding a complaint by Meyers that Officer G. D. Terry made an inappropriate sexual statement to him in the chow hall on November 16, 2016. Meyers's Informal Complaint, Regular Grievance and Level I response also are attached. (Docket Item No. 43-17 at 1-6.);

15.    A November 30, 2017, Regular Grievance form on which Meyers complains of a Booth Control Officer referring to him as "Hey Limp Dick" over the cell intercom. On the top of this form, Meyers has written, "Hearings Officer Counts put me on telephone restriction so Officer Duncan can retaliate on me and grind his hard penis into my head 11/17/2017." (Docket Item No. 43-17 at 9-10.);

16.    A Regular Grievance from Meyers dated October 29, 2015, complaining that he had been sexually harassed and falsely charged with disciplinary code offenses by the librarian at Lawrenceville Correctional Center and attachments. (Docket Item No. 43-18.);

17.    A Grievance Receipt for a Regular Grievance filed by Meyers on November 22, 2016, while he was housed at Green Rock Correctional Center, claiming that Central Classification Services Gail Jones was refusing to protect him from certain unnamed offenders. (Docket Item No. 43-19.);

18.    A September 6, 2017, letter from Marcus Elam, VDOC Regional Administrator, to Meyers, informing him that his

conviction for Offense Code 224 from July 21, 2017, was overturned. (Docket Item No. 43-21 at 17.);

19.    A Lawrenceville Correctional Center Disciplinary Hearing Appeal Response form, dated June 9, 2015, showing that an Offense Code 121 charge from May 18, 2015, had been expunged. (Docket Item No. 43-21 at 18-19.); and

20.    A September 15, 2018, letter from Meyers to Marcus Elam, enclosing numerous Grievances that Meyers claimed he had filed, but had not been processed. Most of the Grievances related to an incident in which Meyers claims he was injured in July 2018 while being placed on a scanning chair, but at least one of these Grievances related to allegations that he was be poisoned by stale, expired and molded honey buns he had purchased from the commissary. (Docket Item No. 43-21 at 1-16).

The court held an additional evidentiary hearing in this matter on February 21-22, 2019. Inmate Chand appeared and, again, testified that Meyers had asked him in the past to provide false statements on VDOC employees, including defendants Swiney and Collins.  Chand said that Meyers had asked him to sign statements regarding events about which he had no knowledge and that Meyers knew he had no knowledge of the events. Chand said that he asked Meyers if what Meyers wanted him to state had really happened, and Meyers responded, "it doesn't matter. It will help my case." Chand said that Meyers had told him that he would help Chand get moved to another facility if Chand would help him. Chand said that Meyers told him that he was requesting punitive damages, and, if he was awarded damages, he would help hire Chand an attorney. He said Meyers also had asked him to give false statements on Correctional Officer Wells and regarding an incident in which a nurse was at his door while he was naked. In particular, Chand said that Meyers asked him to state that he heard certain things said that he did not hear or saw things that he could not see. Chand, again, testified that he believed

that Meyers had mental health problems.   Chand testified that he was not threatened or harassed after testifying on December 27, 2018.   He specifically denied that any of the defendants had threatened him. Chand also specifically stated that his testimony at the hearing was accurate.

Chand admitted that he wrote the January 3, 2019, letter received by the court, (Exhibit No. 1; Docket Item No. 102-1), but he refused to testify to any of the statements contained in the letter, by asserting his Fifth Amendment privilege against self-incrimination.   He specifically asserted his Fifth Amendment privilege in response to a question from Meyers, asking if the facts set out in his January 3, 2019, letter were true. Chand admitted that he was present at a meeting with defendants Collins, Bentley, Swiney, Gilliam, Fannin and Stallard a couple of weeks before he last testified, but he asserted the Fifth Amendment to refuse to answer questions about what was discussed in this meeting.   At another point in his testimony, he said he was told that Meyers had made allegations against him, but he was not told what Meyers had alleged against him. He also testified that about a week and a half before the December hearing, he was accused of having homemade alcohol in his cell. Chand said that he was not charged with possessing contraband.

Chand also testified that he wrote Plaintiff's Exhibit No. 4, (Docket Item No. 102-5), in an effort to assist Meyers prepare for his August hearing in another of his cases. Chand also testified that he wrote Plaintiff's Exhibit No. 5, (Docket Item No. 102-6), and that the information contained in it was accurate.

Wallens Ridge Records Office Manager, Kristie Booth, testified that
Plaintiff's Exhibit No. 6, (Docket Item No. 102-7), was a true and accurate copy of
a DOC-11G, or an Institutional Classification Authority Hearing Notification
Form, for Meyers's removal from general population on August 29, 2018. Booth
said that she had no personal knowledge concerning any of the facts stated on the
Form. The Form stated that, "Offender made statements of fearing for his life and
was placed in RHU-GDT [restrictive housing unit -- general detention] status for
the investigation of the statements." The Form stated that Meyers was scheduled
to appear before the ICA on or after September 3, 2018.

Tina Townsend, R.N. and Wallens Ridge Health Authority, appeared and
brought Meyers's medical and mental health records to the February 21 hearing.
Townsend said that Meyers's medical records did not include any physician's
order for Meyers to receive any physical therapy for gunshot wounds or injuries he
received in a motor vehicle accident before being incarcerated. Townsend said that
Meyers's records showed that he was seen by Nurse Practitioner Ball on August
21, 2018, for a chronic care visit for his hypertension. She said Ball noted that
Meyers was noncompliant with his hypertension medication. Ball noted that
Meyers said that he would not take his medication until he was allowed to self-
medicate. She also said that Ball noted that Meyers was rude and disrespectful.

Townsend said that she had treated Meyers and was aware of his medical
history. She said that she was not aware that Meyers had ever been diagnosed with
cancer. She also said that she was not aware of Meyers suffering from any medical
condition for which he was not receiving adequate medical treatment. Townsend
said that the most recent record in the file showed that Meyers was seen on

February 1, 2019, complaining of boils, abscesses and bed sores on his buttocks. Townsend said the nurse's note reflected that she viewed Meyers's buttocks and saw "zero" signs of any skin breakdown.

Townsend testified that, according to Meyers's medical record, he had x-rays of his ribs and right hand taken on November 2, 2018, and the results were normal with no evidence of any fractures. Townsend also said that Meyers had been prescribed Nitrostatin on November 20, 2018, but the chart did not show that he had entered into a contract to allow him to self-medicate. Townsend said, without viewing Meyers's medication chart, she could not say whether he had been provided the medication or not.

Meyers also testified at his February 21-22 hearing. Meyers testified that he was being housed in Cell D-210 in a long-term segregation unit at Wallens Ridge. According to Meyers, he placed his Complaint in Case No. 7:19cv00003 in the outgoing mail on December 26, 2018. Meyers said that from the moment he arrived at Wallens Ridge on November 20, 2018, he had been subjected to threats of assault and death by other inmates. Meyers said that these inmates made these threats by yelling them at him from inside their cells. Meyers did not identify any specific threat made at any specific time by any specific inmate, other than one by inmate Maliek Black. Meyers testified that Black was housed in cell D-110, while Meyers was housed in cell D-113. When he first arrived at Wallens Ridge, Meyers said that Black yelled at him, "Popcorn, we know who you [are]. You are a rat and a snitch. I am going to kill you."

Meyers said that he was being threatened by Mexican Mafia and Gangster Disciples gang members. Meyers said that the officers at Wallens Ridge had incited the other inmates to threaten him before he arrived at Wallens Ridge. He did not, however, provide any testimony of how he knew this. When asked, again, who had threatened him and when he had been threatened, Meyers said, "all these guys I am dealing with are assassins. They hunt you down."

Meyers said that he was first placed in cell D-113 at Wallens Ridge, but was moved to cell D-210 on November 27 or 28, 2018. He said that the temperature was below freezing most of the time in cell D-210 and that the paint was peeling from the cell walls. At one point, Meyers even testified that he knew that the defendants had "concocted" something toxic and painted his cell with it so that it would peel off and poison him. Meyers claimed that paint flakes fell into his food and in his mouth and that he was breathing in the paint flakes. Meyers also said that his cell is so cold that he had to wear all of his clothing to stay warm.

Meyers admitted that he was being held in segregation housing in a single cell since arriving at Wallens Ridge. He said that the defendants were trying to starve him by forcing him to eat a Common Fare diet. He said he was not receiving 2,000 calories a day. Meyers claimed that he no longer wanted a Common Fare diet. He said that sometimes he received only bread on his meal tray, but he did not state on what date or time this occurred. He said that being forced to eat the Common Fare meals was causing him to suffer from "rickets."

Meyers said that he had not been out of his cell, except to come to court, since he was placed in cell D-210. He said that he had not received a shower or

recreation since August 28, 2018. He specifically said that no one had offered him a shower or recreation since that date. On another occasion in his testimony, Meyers said that he refused to come out of his cell for showers or recreation, because he thought someone would harm him. "I am sitting in a hole for 24 hours a day," he said, "it ain't humane."

Meyers said, because of the death threats he had received since he arrived at Wallens Ridge, he has filed numerous grievances and requested keep separate forms numerous times. He said that he had reported the death threats, but that Wallens Ridge officials refused to investigate "anything." Meyers submitted one Regular Grievance form, dated January 2, 2019, into evidence on which he had complained that Wallens Ridge officials were not providing him with keep separate forms for "Eric Walsh, J. Karavias, Roy Turner, Kevin Watson, D. Taylor, J. Rivera, D. Washington, K. Washington, Maliek Black, L. Lyntton and Mexican Mafia gang member inmates and Gangster Disciple gang members in A, B, C, and D Building at WRSP making death threats to murder me." (Plaintiff's Exhibit No. 9; Docket Item No. 102-9.)

Meyers said that, after his previous hearing in court, Unit Manager Reynolds came to his cell door on December 28, 2018, and said, "Swiney told me to tell you he's going to kill you." He said that Wallens Ridge officers were refusing to provide him with keep separate forms and that VDOC officials were refusing to return him to a Protective Custody Unit. Meyers also stated that he was being held under an incorrect security level 5 and that he had filed several grievances asking VDOC officials to correct his security level. Meyers claimed that VDOC officials had "falsified" his security level to justify transferring him to Red Onion.

Meyers testified that he was placed in segregation housing at Red Onion on August 29, 2018, after he told defendant Collins that he needed informal complaint forms to complain that inmate Jamal Thompson had made death threats toward him and had masturbated in front of him. Meyers said that Collins, "put him underneath investigation" and transferred him to a segregation cell D-310 at Red Onion. Meyers also said that Swiney had Baker file a false 201 disciplinary offense against him, alleging he had refused an order while he was at Red Onion. Meyers said that Swiney had told Baker to do this because they could hold Meyers in segregation on general detention for investigation of his complaints only 15 days. Meyers said that they had to file a charge against him to keep him in segregation longer.

Meyers submitted a September 12, 2018, letter from Lt. J. Fannin, which said that he had investigated Meyers's allegations of sexual harassment by Thompson on August 26, 2018, and had determined the allegations to be unsubstantiated. (Plaintiff's Exhibit No. 17; Docket Item No. 102-16.)

Meyers said that, while he was housed in cell D-310, Red Onion officials placed Thompson in cell D-309, and Thompson threw urine and feces in the air vent that both cells shared. Meyers said that being hit with Thompson's bodily fluids gave him sores on his arms and face. Meyers said that, after he refused to sign up for the Common Fare diet, defendant Stallard became upset and had him transferred to the B4 pod at Red Onion, where he was forced to wear his yellow protective custody inmate uniform for two weeks.

-24-

Meyers also claimed that he was not receiving adequate medical treatment at Wallens Ridge, in that he said he suffered from terrible bleeding bed sores on his buttocks. He said that when he asked to be seen for the bed sores, the nurses claimed there were no bed sores on his buttocks. Meyers also testified that the VDOC medical staff would not document that he suffered from cancer because they did not want to provide him any treatment. Meyers filed an Inmate Request For Information form on November 24, 2018, while housed in cell D-111, on which he complained, among other complaints:

> The paint falling from the ceiling and walls causing me seizures and heart pains/vomiting blood. In severe pain/chronic care inmate. The inhaler I was given doesn't have counter on it. I need my nitroglycerine Nitrostat heart medication. … I'm having severe chest pains and bloody diarrhea, ,,, I should have been allowed to use my 2 full [Albuterol] inhalers I came with per chronic care. Nurse I don't submit this request to you to be inconsiderate of your professionalism, but I came to Wallens Ridge State Prison on 11-20-2018 which the nurse on duty at the time took my inhalers/knee brace that is for my right knee injury that was torn apart in a car accident when I broke my neck, and my right knee swells up and my 9 gunshot injuries gives me severe pain and my knee brace alleviates the pain. I need my knee brace as soon as possible….

(Plaintiff's Exhibit No. 11; Docket Item No. 102-11.)

Meyers filed a Regular Grievance form, dated December 17, 2018, on which he listed, among other complaints:

> I am coughing up blood and having bloody diarrhea from cancer that ROSP and Wallens Ridge State Prison Dr. Fox and physicians here refuse to treat, and severe chest pains. My [Albuterol]

asthma inhaler [was] taken by nurse C. Morgan when I arrived here and she issued me levalbuterol/tartrate a generic inhaler that has been causing me severe chest pains and I vomit blood. I am only allowed to keep and have 3 Nitrostat – nitroglycerin pills per 2 weeks, and I will have a heart attack and die before the nurses and security can get my nitroglycerin – Nitrostat medication to me. … I [am] being held in a cell (D-2-210) in below freezing temperatures I have to sleep in all 3 of my uniforms, a towel on my head and I still have hypothermia in my body and my 9 gunshot injuries and car accident injuries to my neck, back, hip and injuries caused by J. M. Messer and P. Deel not treated.

(Plaintiff's Exhibit No. 10; Docket Item No. 102-10.)

Meyers filed a Regular Grievance form, dated January 2, 2019, on which he wrote:

Since I arrived at Wallens Ridge State Prison I have requested informal complaints from Sergeant Cook and Sergeant Kirby and other sergeants and they have refused to give them to me for my cancer and for me coughing up blood and having bloody diarrhea. Nurse Morgan taking my knee sleeve when I arrived on 11/20/2018. The doctor said he re-ordered it but it was never brought to me. The medical staff took my [Albuterol] inhalers for my [asthma] and gave me a generic inhaler that causes me to vomit excessively, and the doctor at WRSP refuses to treat me for my ribs, head, shoulders, chest, and legs injuries caused by J. M. Messer at ROSP on 07/19/18 and for my testicles injury caused by P. Deel at ROSP on 09/28/18 and other legs and burns injuries caused by P. Deel on 09/30/18 and on 10/04/2018 and Inmate J. Thompson biological waste assault on me at ROSP from 09/07/18 until 09/10/2018 or treat me for gunshot/mva injuries.

(Plaintiff's Exhibit No. 12; Docket Item No. 102-12.)

On January 18, 2019, Meyers filed another Regular Grievance form addressing his medical care. On this form, Meyers stated, in part:

> Medical nurses refuse to refill my medications. The WRSP doctor never ordered Mobic, muscle relaxer, Nitrostat. This complaint is filed on regular grievance due to Sgt. Short, Sgt. Cook, Sgt. Nunley, all D-Building sergeants and Lt. Hall, Lt. Lite, J. Burgin and all D-Building Lt's refusing to give me … informal complaints or any forms and the nurses refuse to sign me up for sick call or refill my medications. This complaint and Regular Grievance subject is filed on WRSP Physician Head Nurse, and Health Services Administrator [who] refuse to comply with VADOC Operating Procedure 720.2 Medical Screening and levels of care. The WRSP physician refuses [to] treat my 9 gunshot injuries, and the bullet lodged in my aorta. The physician refuses to treat my cancer, coughing up blood, having bloody diarrhea, and hemorrhaging. The WRSP doctor refuses to treat my head, neck, back, legs injuries from car accident. The doctor also refuses to treat my testicles, head, broken ribs, chest, legs, hand and shoulders injuries, face burns, back and neck injuries that ROSP employees J. M. Messer, Ofc. P. Deel, C. Stanley, Edward Gwinn caused me. I have ribs injury from Ofc. Nixon making me wear electrocution belt…. WRSP D-Building officers are putting toxins and chemicals into my food and coffee and Kool Aid juice and sliding the pills and toxins from out [of] their black gloves dropping the toxic substances into my tray and beverages and the investigators not saying or doing anything about it because [they're] all Jim Crow white supremacist racist that hate black men and Ofc. Nixon and another officer re-injured my ribs on 12/27/2018 making me wear 100,000 volt electrocution belt 11 hours straight.

(Plaintiff's Exhibit No. 13; Docket Item No. 102-13.)

On January 2, 2019, Meyers filed an Inmate Request For Information form, stating that he was not supposed to be on the Common Fare diet. (Plaintiff's Exhibit No. 19; Docket Item No. 102-18.)  On this form, Meyers wrote:

On 11-20-2018 I arrived at WRSP. I did not request to be on
Common Fare diet at this institution. Nor did I submit a request form
to the WRSP Treatment Department … or to counselor Caughron to
be on a Common Fare diet at WRSP. On 09-14-2018 I specifically did
not request to Counselor B. Stallard at ROSP to continue to be on
Common Fare Diet. Nor did I sign his Common Fare form to renew a
Common Fare contract.  The white racist pod officers in D2 pod have
been enforcing the Common Fare diet meals on me so that they can
mark the trays they give to me to spit in them or put foreign
substances, and toxins into my meal trays. They have, and I'm
identifying all officers on both daytime shifts that work the D2 pod
have made it their main priority to force me to take the Common Fare
meal trays that I did not request at WRSP institution.  …. Several
Common Fare meal trays that I've received at Wallens Ridge State
Prison since I've arrived only had bread on [them]. [There] was no
other food on the Common Fare tray. On 01-02-19 at lunch time the
tall white male officer serving lunch trays stated that he had to call for
my Common Fare meal tray. He returned 20 minutes later with four
slices of bread and a doughnut; No beans, peanut butter nor fish or
protein was on the lunch tray.

(Docket Item No. 102-18.)  The response stated that Meyers was on the Common

Fare diet in the CORIS system and that he would have to request his counselor to

begin the process to be removed. (Docket Item No. 102-18.)

On January 28, 2019, Meyers filed a Regular Grievance regarding his

request to be removed from the Common Fare diet because it was causing him to

suffer from "ricket[]s in my bones, starvation, fatigue, psychological abuse mental

anguish, and emotional distress from the under servings and severely reduced

calorie intake in the common fare meal diets and insufficient protein and

carbohydrates intake." (Plaintiff's Exhibit No. 14; Docket Item No. 102-14 at 1.)

Meyers also wrote: "Most of the meals I received were only bread on trays no

vegetables, poultry, fish, fruit." (Docket Item No. 102-14 at 1.)  B. J. Ravizee denied the Grievance at intake based on her statement that Meyers had been removed from the Common Fare diet. (Docket Item No. 102-14 at 2.) The response to an attached Informal Complaint shows that Meyers was removed from the Common Fare diet on January 20, 2019. (Docket Item No. 102-14 at 3.)

Meyers also stated that he had filed a PREA complaint against hearing officer M. Counts because, when he attended hearings before her, she kept her hands under the table in her crotch.  Meyers claimed that, as a result of him filing this complaint, Counts had told inmate Leon Anderson to threaten him. Meyers did not provide when this threat was made or what was said by Anderson.

Meyers insisted that this court previously had ordered that he be transferred to and held in Protective Custody.  Meyers also insisted that the undersigned magistrate judge previously had ordered that he be kept separate from certain other VDOC inmates.

Joseph Ely, the D Building Unit Manager at Wallens Ridge since December 25, 2018, also testified at the February 22 hearing.  Ely said that, as Unit Manager, he was over the day-to-day operations of the D Building at Wallens Ridge.  Ely said that Meyers was housed in a handicapped accessible single cell in the D Building. He said that Meyers was housed in a restrictive housing unit, which meant he was in a single cell and that, when removed from his cell, he would shower or take recreation without the presence of any other inmates. Ely said that restrictive housing units were the most secure units within the VDOC.  He said that Protective Custody Units were less secure than restrictive housing units.

Ely said that he made rounds every morning and evening through every pod in the D Building at Wallens Ridge. He said that, during these rounds, he had attempted to speak to Meyers, but Meyers had never spoken to him. Ely testified that Meyers had never told him that any other inmate at Wallens Ridge had threatened him. Ely did admit, however, that he had responded to an Informal Complaint that Meyers had filed on January 10, 2019. (Plaintiff's Exhibit No. 20; Docket Item No. 102-19.) On this Informal Complaint, Meyers wrote, among other items:

> Since I … arrived at WRSP on 11/2018 until this date Lt. Hall, Lt. Lite, Sgt. Cook, Sgt. Nunley, Sgt. McRay, Sgt. Kirby, all the "sergeants," and all the "luetenants"[sic] refused to give me a[n] informal complaint to file complaints on inmates Eric Walsh, J. Karavias, Roy Turner, J. Rivera, D. Taylor, Maliek Black, K Lyntton, K. Washington, D. Washington, F. Altizer, D. Shumaker, Gangster Disciples gang member inmates, Mexican Mafia gang member inmates, and inmates in A, B, C, and D-Building of WRSP making death threats to murder me….

(Plaintiff's Exhibit No. 20; Docket Item No. 102-19.)

Ely testified that all cells in a pod in the D Building at Wallens Ridge were on the same heating system. He said that the temperature for the unit was set at 70 degrees year round and that no one could adjust it. Although he admitted that he had never personally witnessed it, Ely testified that Meyers was offered a shower every other day and recreation every day. He said that he knew these were being offered to Meyers because they were being offered to every other inmate in the building. While Ely claimed that Meyers had never complained to him that he was being denied a shower or recreation, he conceded that the January 10, 2019,

Informal Complaint, to which he responded, also stated: "I am being denied showers, recreation, haircuts, copies of DOC 11 forms, medical treatment, safe cell, full meals." (Plaintiff's Exhibit No. 20; Docket Item No. 102-19.)

Ely said that, regardless of diet, no inmate at Wallens Ridge is ever fed only bread on a food tray.

## II. Analysis

As stated above, the court has determined that at least three of Meyers's previous complaints have been dismissed with prejudice for failing to state a claim upon which relief may be granted under 28 U.S.C. § 1915A(b)(1). Therefore, under the Prison Litigation Reform Act, ("PLRA"), Meyers may not proceed with these actions unless he pays the full filing fee upfront or shows that he is under "imminent danger of serious physical injury." 28 U.S.C.A. § 1915(g) (West 2006). To prove that he is under imminent danger of serious physical injury, an inmate must show that the

> "… conduct complained of threatens continuing or future injury, not whether the inmate deserves a remedy for past misconduct." *Martin v. Shelton*, 319 F.3d 1048, 1050 (8th Cir. 2003). Vague, speculative, or conclusory allegations are insufficient to invoke the exception of §1915(g); rather, the inmate must make "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury." *Id.*

*Johnson v. Warner*, 200 F. App'x 270, 272 (4th Cir. 2006). Based on the above evidence, I recommend that the court find that Meyers was not in imminent danger

of serious physical injury at the time that he filed his complaints and deny his requests for IFP status for these actions.

Pursuant to the "Prison-Mailbox Rule" described in *Houston v. Lack*, 487 U.S. 266, 275 (1988), Meyers's complaints were filed with the court when they were placed by him in the Red Onion prison mail system for mailing to the court. Meyers testified that this occurred on September 29 and October 10 and 25, 2018, for the complaints in Case No. 7:18cv00485 and on December 26, 2018, for the complaint in Case No. 7:19cv00003. The uncontradicted evidence shows that, at the time of the filing of his three complaints in Case No. 7:18cv00485, Meyers was housed in Red Onion segregation cell B-410, where no other inmates had any access to him or could pose any danger to him. Also, once moved to the B Building at Red Onion, few of the named defendants in Case No. 7:18cv00485 had any further access to Meyers to pose any continuing danger to him. The uncontradicted evidence also shows that, at the time of the filing of his complaint in Case No. 7:19cv00003, Meyers was held in a segregation cell, cell D-210, at Wallens Ridge, where no other inmates had any access to him or could pose any danger to him.

Meyers's complaints raise a myriad of claims. Based on the undersigned's review of his complaints, they contain the following claims:

Complaint filed September 29, 2018, (Case No. 7:18cv00485, Docket Item No. 1):

Claim #1:    Claims defendant Swiney circumvented court orders to house Meyers in protective custody and separate from various other inmates in

protective custody by changing Meyers's security level to level 5. Also, claims Swiney had Officer Baker[4] file a false 201B charge against him, falsely claiming that he refused to return to the Protective Custody Unit at Red Onion.

Claim #2:     Claims W. Swiney and J. Artrip[5] failed to list inmates making death threats and rape threats against Meyers on Meyers's enemy list and keep them separate from Meyers.

Claim #3:     Claims Swiney had Officer Baker file a false 201B charge against Meyers, claiming Meyers refused to go to the Protective Custody Unit after Unit Manager Collins had him placed in segregation housing for his safety. Claims Inmate Jamal Thompson made threats to kill him and masturbated in front of him. Claims keep separate forms were not given to him until after the 201B charge was filed against him.

Claim #4:     Claims he is being retaliated against for prior litigation filed in this court, in which Meyers claims that the undersigned instructed W. Swiney to provide him with Enemy Summary Forms to list J. Runren, W. Thomas, Jeremy Soto, Rodriguez, Jamar Thompson, R. Riding, Pete Martin and R. Palmer/K. Palmer aka Wakil as "known enemies" due to their threats to rape and kill him.   Claims unnamed person(s) instigated protective custody inmates in the C6 pod to assault, fatally wound and kill him. Claims J. Artrip, W. Swiney and D.C. Stallard[6] refused to provide him with Enemy Summary Forms until September

---

[4] Despite this claim, Meyers did not list Officer Baker as a defendant in this Complaint. (Docket Item No. 1 at 1.)

[5] Despite this claim, Meyers did not list J. Artrip as a defendant in this Complaint. (Docket Item No. 1 at 1.)

[6] Despite this claim, Meyers did not list D.C. Stalland as a defendant in this Complaint. (Docket Item No. 1 at 1.)

14, 2018. Claims that Swiney, A. Galihar and Keith Dawkins's secretary, Gail Jones, changed his security level classification from "P" (protective custody) to level 5 and recommended that Meyers be moved from protective custody and transferred to Wallens Ridge State Prison general population so Meyers would be killed for being an informant and cooperating with law enforcement. Claims Swiney and Sgt. Mannon[7] moved Meyers out of the restrictive housing unit on September 26, 2018, and moved him to the B4 unit in general population where inmates were making threats to kill him. Claims he did not refuse to return to the Protective Custody Unit. Claims Marcus Elam refuses to stop Kiser, M. Counts and W. Swiney from "racketeering my funds."

Claim #5:    Seeks injunctive relief to be placed in protective custody.

Claim #6:    Wants to be moved to a safer protective custody unit. Claims that W. Swiney, C. Stanley, Edward Gwinn, C. Dickerson, Dr. Fox, J. Bledsoe and Warden Jeffrey Kiser confiscated his walker so that he would lose permanent use of his legs after being confined to a wheelchair. Claims Swiney, Warden Kiser, Dickenson[8] and Dr. Fox[9] did not provide any rehabilitation, physical therapy or exercise or a health trainer to prevent further debilitation. Claims Dr. Fox refuses to treat him for severe neck, back, head and right hip, right knee and feet injuries from a prior car crash and for a bullet lodged in his heart.

---

[7] Despite this claim, Meyers did not list Sgt. Mannon as a defendant in this Complaint. (Docket Item No. 1 at 1.)

[8] Despite this claim, Meyers did not list Dickenson as a defendant in this Complaint. (Docket Item No. 1 at 1.) Meyers refers to this individual as both "Dickenson" and "Dickerson."

[9] Despite this claim, Meyers did not list Dr. Fox as a defendant in this Complaint. (Docket Item No. 1 at 1.)

Claims he is hemorrhaging and coughing up blood, with chest pains, as well as bloody diarrhea. Claims he is not being allowed to have nitroglycerin, pain medication or muscle relaxers. Claims Warden Kiser and unnamed prison officials have refused him mental health services. Claims Officer Edward Gwinn strangled him with another unnamed officer and burned his face severely. Claims Dr. Fox and Dr. E. Boakye[10] refused him medical treatment. Claims his ribs have been broken since July 19, 2018, by Lt. J. Messer and unnamed shakedown officers. Claims Dr. Fox refuses to treat his problems with his ribs, head, shoulders, chest and legs. Claims Officer Perrigon[11] assaulted him in his testicles on September 26, 2018, for being in protective custody. Claims M. Counts, T. Dorton, W. Swiney and F. Stanley refused to stop racketeering/stealing his money from his inmate account.

Claim #7:    Claims Judge James Jones, Judge Glen Conrad and Magistrate Judge Robert Ballou, of this court, have refused to find that Meyers was under imminent danger and allow him to pursue his claims in forma pauperis. Claims violation of Eighth Amendment cruel and unusual punishment (unspecified). Claims Investigators J. Fannin and J.D. Bentley have conspired with Warden Jeffrey Kiser and W. Swiney and other unnamed Red Onion employees to intimidate him to sign out of protective custody assignment. Claims Fannin, Bentley, K. Counts and J. King have obstructed and tampered with his outgoing

---

[10]    Despite this claim, Meyers did not list Dr. Boakye as a defendant in this Complaint. (Docket Item No. 1 at 1.)

[11]    Despite this claim, Meyers did not list Officer Perrigon as a defendant in this Complaint. (Docket Item No. 1 at 1.)

legal mail to the court by opening and reading it. Also claims Fannin
and Bentley have been making false reports to the judges so that the
judges would dismiss his civil actions. He claims that he has reported
numerous attempted murders by unnamed employees and inmates.
Claims Fannin and Bentley filed false 121 disciplinary charges against
him to avoid civil liability. Claims that Fannin and Bentley had M.
Counts, L. Mullins and T. Dorton "racketeer" his funds from his
prison inmate account.

## Complaint filed October 10, 2018, (Case No. 7:18cv00485, Docket Item No. 8):

Claim #1:   Claims Judge Jones, Judge Conrad and Judge Ballou refuse to allow
him to prosecute J. Kiser, M. Counts, L. Mullins, W. Swiney, Marcus
Elam, J. Bentley, J. Fannin, K. Counts, Tammy Barbetto, unnamed
Officers in Charge and T. Dorton for "racketeered funds from prison
account" to force him off of protective custody status.   Claims
unnamed prison employees are carrying out serious assaults on him to
kill him and housing him in B4 general population pod.

Claim #2:   Claims from February 24, 2017, to October 4, 2018, unnamed prison
employees caused him "serious injuries." Claims A. Galihar and W.
Swiney had Officer Baker[12] falsely allege to Gail Jones that he refused
to return to the Protective Custody Unit to circumvent the court's
instructions to W. Swiney and J. Artrip to provide him with keep
separate forms and keep him separated from Protective Custody Unit

---

[12] Despite this claim, Meyers did not list Officer Baker as a defendant in this Complaint.
(Docket Item No. 8 at 1.)

inmates making threats to him.

Claim # 3:     Claims seven writs of mandamus and two Section 1983 actions were sent to this court and that Clerk Dudley refused to process them. Claims Gail Jones removed him from protective custody status, violating a prior court order to be assigned to Protective Custody Unit status for his safety. Claims Marcus Elam, Tammy Barbetto and Paul Haymes have allowed the above employees to commit PREA, (Prison Rape Elimination Act), retaliation against him to get him killed or seriously injured and embezzled/racketeered funds from his prison inmate account.

## Complaint filed October 25, 2018, (Case No. 7:18cv00485, Docket Item No. 20):

Claim #1:      Claims Warden J. Kiser and A. Galihar made him wear protective custody uniform in B4 housing unit to be killed for being an informant. Claims Judges Jones and Conrad and Magistrate Judge Ballou, Clerk Dudley and Tim Taylor[13] refuse to let him "prosecute the other named defendant prison employees for causing" him injuries and for racketeering activities and violating federal court orders for Meyers to be assigned to protective custody and F. Stanley and M. Counts for racketeering funds from his prison account.

Claim #2:      Claims Warden J. Kiser, M.L. Counts, D. Tate, A. Galihar, J. Fannin, J.D. Bentley, K. Counts, W. Swiney, Marcus Elam, J. Messer, S. Escoffery, F. Stanley, T. Dorton, Fiscal Tech and Unit Manager

---

[13] Despite this claim, Meyers did not list Tim Taylor as a defendant in this Complaint. (Docket Item No. 20 at 1.)

Duncan had Messer and an unnamed officer break Meyers's ribs and cause him head and shoulder injuries. Claims he was forced to be removed from protective custody status to security level 5 general population by W. Swiney, A. Galihar and Gail Jones to circumvent court orders to Swiney to document Meyers's keep separate requests and keep him separate from unnamed inmates making threats against him.

Claim #3:   Claims F. Stanley is overcharging him for legal mail postage and T. Dorton refuses to pay him for working from October 13 to November 19, 2017.   Claims the named prison defendants had unnamed prison guards and officers file false charges on him to stack fines on him for reporting their sexual abuses, assaults and injuries committed on him. Claims J.B. Messer[14] refuses to process any further grievances he submits regarding officer assaults. Claims M. Counts, F. Stanley and T. Dorton are racketeering funds from his prison inmate account.


Complaint filed December 26, 2018, (Case No. 7:19cv00003, Docket Item No. 1):


Claim #1:   Claims inmates Eric Walsh, J. Karavias, Roy Turner, Kevin Watson, D. Taylor, Maliek Black, K. Lyntton, J. Rivera, K. Washington, D. Washington and other Wallens Ridge violent gang member inmates were making death threats against him. Claims has not received shower, haircut, shave, outside recreation or medical treatment. Does

---

[14] Despite this claim, Meyers did not list J.B. Messer as a defendant in this Complaint. (Docket Item No. 20 at 1.) Meyers testified at the evidentiary hearing that J. Messer and J.B. Messer were two different persons.

not name any specific defendant in this claim.

Claim #2:   Claims defendants Gail Jones and Keith Dawkins removed him from protective custody status by approving his assignment to security level 5 in retaliation, but does not state what protected conduct defendants are retaliating against. Claims defendants Carl Manis, Unit Manager Collins, J. Kiser, W. Swiney, Assistant Warden Combs, Major Anderson, QMHP Monahan, Gail Jones, Henry Ponton and Keith Dawkins[15] refused to assign him to protective custody or to provide him with keep separate forms or investigate the death threats against him.

Claim #3:   Claims M. Williams,[16] Wallens Ridge fiscal tech and unnamed mail clerks are "racketeering" funds from his prisoner account. Claims being housed in below-freezing cell, given only bread to eat and being poisoned by peeling paint. Claims Officer Hounshell, Sgt. Shorts and Officer Phillips[17] stole his prayer rug, batteries, books, headphones, ink pens and pencils.

Claim #4:[18]   Claims Defendants Carl Manis, J. Kiser and others[19] have denied him mental health and medical treatment, racketeered funds from his prisoner account, filed false disciplinary charges against him, altered or forged legal postage loans and failed to give him due process.

Several of Meyers's claims do not allege that the defendants' actions placed

---

[15] The Complaint also lists Investigator C. Flemming, Investigator Harris and Counselor Young in this claim, but these persons are not listed as defendants in the Complaint.

[16] Despite this claim, Meyers did not list M. Williams as a defendant in this Complaint.

[17] Despite this claim, Meyers did not list these persons as defendants in this Complaint.

[18] These claims are contained in Meyers's "Claim for Relief" in his Complaint.

[19] This claim also lists T. Dorton and M. Williams, who are not listed as defendants in Meyers's Complaint.

him in any imminent danger of serious physical injury, and Meyers offered no
evidence of any such danger posed by these claims at the December 27 or February
21-22 evidentiary hearings. In particular, there is no evidence before the court that
Meyers's claims against defendants M. Counts, T. Dorton, Swiney, F. Stanley,
Fannin, Bentley, L. Mullins, Kiser, Elam, K. Counts, Barbetto, an unnamed Officer
in Charge, Haymes and Manis based on "racketeering," embezzling and/or stealing
money from his inmate account posed any imminent danger of serious physical
injury.  Also, there is no evidence before the court that Meyers's claims against
various court officials for either not filing various documents, not allowing him to
"prosecute" various prison officials or not granting him the relief requested posed
any imminent danger of serious physical injury to Meyers. These claims included
the claims against Judges Jones and Conrad, Magistrate Judge Ballou and Clerk
Dudley. The same is true for Meyers's claim that Fannin, Bentley, K. Counts and J.
King have obstructed and tampered with his outgoing legal mail to the court by
opening and reading it. The same, also, is true of Meyers's claims that Fannin and
Bentley filed false 121 disciplinary charges against him to avoid civil liability, that
F. Stanley is overcharging him for legal mail postage, that T. Dorton refuses to pay
him for working from October 13 to November 19, 2017, that named prison
defendants had unnamed prison guards and officers file false charges on him to
stack fines on him for reporting their sexual abuses, assaults and injuries
committed on him, that J.B. Messer refused to process any further grievances he
submits regarding officer assaults, that unnamed prison officials have altered or
forged postal loans in his name, that Hounshell, Shorts and Phillips stole certain of
his personal property or that unnamed prison officials failed to provide him with
due process.

Based on my review of Meyers's remaining claims, I find that they fall in one of five categories. Several of Meyers's claims allege that he did not receive necessary medical or mental health treatment or equipment. These include his claims that Swiney, C. Stanley, Gwinn and Warden Kiser[20] confiscated his walker so that he would lose permanent use of his legs after being confined to a wheelchair, that Kiser[21] did not provide any rehabilitation, physical therapy or exercise or a health trainer to prevent further debilitation, that Dr. Fox refuses to treat him for severe neck, back, head and right hip, right knee and feet injuries from a prior car crash and for a bullet lodged in his heart, that he is hemorrhaging and coughing up blood, with chest pains and bloody diarrhea, that he is not being allowed to have nitroglycerin, pain medication or muscle relaxers, that Warden Kiser and unnamed prison officials have refused him mental health services, that Dr. Fox and Dr. Boakye refused him medical treatment[22] and that Manis and Kiser have denied him mental health and medical treatment. I find that Meyers's evidence of any danger posed by these claims does not rise above the type of vague, speculative or conclusory allegations that courts have found insufficient to prove imminent danger of serious physical injury. Meyers claims that he suffers from a number of chronic health conditions due to prior gunshot wounds, a motor vehicle accident and prior assaults by other inmates and VDOC employees. Meyers did not, however, offer any medical evidence that he suffered from any specific physical or mental health ailment that required treatment at the time of the filing of these complaints. To the contrary, Townsend testified that Meyers did not

---

[20] Meyers also alleged that Dickerson, Dr. Fox and Bledsoe were involved in this claim, but he did not list these individuals as defendants in any of his complaints.

[21] Meyers also alleged that Dickerson and Dr. Fox were involved in this claim, but he did not list these individuals as defendants in any of his complaints.

[22] Again, Meyers did not list either Dr. Fox or Dr. Boakye as a defendant in any of his complaints.

suffer from any condition for which he was not receiving adequate medical treatment. Further, I find Meyers's testimony on this issue less than credible. In particular, Meyers testified that he suffered from "stomach cancer," which was untreated. When questioned further on this topic, Meyers admitted that no physician had ever diagnosed him with cancer, but he knew he had cancer because he was coughing up blood and passing blood in his stools. Townsend testified that, to her knowledge, no one had ever diagnosed Meyers with cancer. Also, Meyers claimed that he had documentary proof of the ongoing denial of his requests for medical treatment. The documents submitted by Meyers, however, refuted this claim. In particular, in these documents, Meyers, himself, admitted that he was seen by Nurse Yates on October 12, 2018, and Nurse Practitioner Ball on October 26, 2018, and that he was repeatedly instructed to sign up to see a physician. (Plaintiff's Exhibit No. 3; Docket Item No. 31-3 at 3.) Meyers also insisted that he suffered from severe bed sores and boils. The medical evidence presented through Townsend, showed no evidence of any such problem. Further, Meyers claimed his nitroglycerin was being withheld from him, but he admitted that he was provided this medication on a Regular Grievance he filed on December 17, 2018. (Docket Item No. 102-10.) Thus, I find that Meyers has failed to prove that any of these claims posed an imminent danger of serious physical injury to him at the time of the filing of his complaints.

Other of Meyers's claims involve his ongoing request to be kept separate from other inmates, who also were housed in the Protective Custody Unit at Red Onion or at Wallens Ridge and who Meyers claimed had threatened to assault or kill him. These include Meyers's claims that Swiney and Artrip refused to provide him with Enemy Summary Forms until September 14, 2018, and failed to list other

Protective Custody Unit inmates who were making death threats and rape threats against him on his enemy list and keep them separate from him. Regarding the claims that various inmates and prison gangs at Wallens Ridge had made death threats against him and that defendants Manis, Collins, Kiser, Swiney, Combs, Anderson, Monahan, Jones, Ponton, Dawkins and others refused to assign him to protective custody, to provide him with keep separate forms or to investigate the threats against him, Meyers, himself, testified that, at the time of the filing of his Complaints in Case No. 7:18cv00485, he had been removed from the Protective Custody Unit and was housed in a segregation cell in the B4 housing unit at Red Onion. Thus, Meyers has admitted that, at the time of the filing of his Complaints, he had been removed from any ongoing threat posed by other Protective Custody Unit inmates at Red Onion. Meyers also testified that, at the time of the filing of his Complaint in Case No. 7:19cv00003, he was being housed in a segregation cell at Wallens Ridge with no direct contact with any other inmates. Thus, none of the inmates who Meyers claimed threatened him had any access to him.

Other of Meyers's claims appear to allege that he was the victim of assaults by various defendants or placed in danger on prior occasions by the actions of various defendants. These claims include that Officer Gwinn strangled him with another unnamed officer and burned his face severely when he first arrived at Red Onion, that Officer Perrigon assaulted him in his testicles on September 26, 2018, that, from February 24, 2017, to October 4, 2018, unnamed prison employees caused him "serious injuries," that Elam, Barbetto and Haymes have allowed the Red Onion employees to commit retaliation against him to get him killed or seriously injured for filing PREA claims, that Kiser and Galihar made him wear a protective custody uniform in the B4 housing unit to identify him as an informant

and that Kiser, Counts, Tate, Galihar, Fannin, Bentley, K. Counts, Swiney, Elam, J. Messer, Escoffery, F. Stanley, T. Dorton and M. Dorton had Messer and an unnamed officer break Meyers's ribs and cause him head and shoulder injuries. Meyers's own testimony at the evidentiary hearing destroyed his credibility on at least one of these claims. In particular, Meyers offered no testimony that an "Officer Perrigon" had ever assaulted him. Instead, Meyers testified, not once, but twice, that an Officer Deel assaulted him three times by throwing food and food containers through his cell door tray slot, hitting him. Meyers's Complaints, however, do not contain any claim against an Officer Deel. Meyers's credibility regarding his other claims of assaults or acts of endangerment by Red Onion employees is, at best, questionable, based on the testimony of Meyers's inmate witnesses. None of Meyers's inmate witnesses could confirm that Meyers had ever been the victim of any assaults, threats or acts of retaliation at the hands of any Red Onion employee. Furthermore, inmate Chand, despite his letter to the court, has twice testified under oath that Meyers had urged him to offer false written affidavits or to testify falsely against various Red Onion employees. Even if the court were to accept Meyers's testimony as credible, Meyers has offered no evidence that any of these prior incidents posed any imminent danger of serious physical injury to him at the time of the filing of his Complaints.

Meyers also has made claims about his conditions of confinement at Wallens Ridge. These claims include that he is being held in below-freezing cells, poisoned by peeling paint, denied food, showers, recreation, haircuts and certain of his personal property. Insofar as any of these conditions could potentially pose an imminent danger of serious physical injury, I find Meyers's testimony not credible. Instead, I find the testimony of Unit Manager Ely the more credible. Ely testified

-44-

that the D Building pods are maintained at a constant temperature of 70 degrees. Ely also testified that no inmate at Wallens Ridge has been fed only bread. He also said all inmates in D Building are routinely offered showers and recreation. Again, Meyers's own testimony that his cells have been specially treated with a toxic substance designed to peel and poison him hurts his credibility across all these similar claims.

The remainder of Meyers's claims appear to revolve around various defendants' actions removing him from protective custody status, classifying him as a security level 5 and recommending that he be transferred to general population at Wallens Ridge. These include his claims that Swiney circumvented court orders to house Meyers in protective custody and keep him separate from various other inmates in protective custody by changing Meyers's security level to 5, that Swiney, Galihar, Dawkins and Gail Jones changed his security level classification from "P" (protective custody) to level 5 and recommended that Meyers be moved from protective custody and transferred to Wallens Ridge general population so Meyers would be killed for being an informant and cooperating with law enforcement, that Swiney moved Meyers out of the restrictive housing unit on September 26, 2018, and moved to him to the B4 housing unit in general population where inmates were making threats to kill him, that Meyers did not refuse to return to the Protective Custody Unit and seeking injunctive relief to be returned to a safer Protective Custody Unit, that Fannin and Bentley have conspired with Warden Kiser and Swiney and other unnamed Red Onion employees to intimidate him to sign out of protective custody assignment, that Galihar, Swiney and Officer Baker falsely alleged to Gail Jones that Meyers refused to return to the Protective Custody Unit to circumvent the court's

-45-

instructions to Swiney and Artrip to provide him with keep separate forms and keep him separated from Protective Custody Unit inmates making threats to him and that defendants Manis, Collins, Kiser, Swiney, Combs, Anderson, Monahan, Jones, Ponton and Dawkins refused to assign him to protective custody or to provide him with keep separate forms or to investigate threats made against him by Wallens Ridge inmates. Based on the evidence before the court, I find that none of these claims placed Meyers in any imminent danger of serious physical injury. Again, Meyers admitted that, at the time of the filing of his Complaints in Case No. 7:18cv00485, he was housed in a segregation cell in the B4 housing unit without any direct contact with other inmates or correctional officers. Meyers also testified that he has been at Wallens Ridge housed in a segregation cell since November 20, 2018. Thus, at the time of the filing of his Complaint in Case No. 7:19cv00003, he was protected from any contact with any other inmates. In fact, Meyers, at his evidentiary hearing, repeatedly stated that he has not even left his cell for showers or recreation since August 2018. Thus, regardless of his security classification, Meyers was being protected from all other inmates and from Red Onion employees at the time that he filed these Complaints.

I want to state clearly that I find many of Meyers's claims incredible. Meyers's credibility is hurt by the vague nature of many of his claims. Many of his claims contain no allegation of any specific action by any specific defendant on any specific date. His credibility also is hurt by the inconsistencies between his written Complaints and his testimony. Other than as noted above, these inconsistencies also include his written claim that he was forced to wear his Protective Custody Unit uniform when transferred to the B Building. Meyers testified that this occurred only the first 14 days after he was transferred from

Protective Custody to the D Building. Also, despite Meyers's repeated claims to the contrary, I have been unable to locate any previous order from this court in any of Meyers's previous cases requiring that Meyers be housed in a Protective Custody Unit or that he be kept separate from any particular inmate. In particular, Meyers's repeated incorrect assertion to this Magistrate Judge that she previously had ordered that he be kept separate from certain other inmates only further damaged Meyers's credibility with regard to his claims that he was in imminent danger.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

Meyers was not under imminent danger of serious physical injury at the time he filed his Complaints.

## RECOMMENDED DISPOSITION

For the reasons stated above, I recommend that the court find that Meyers was not under imminent danger of serious physical injury at the time he filed his Complaints and deny his applications to proceed in forma pauperis.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, Chief United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

**DATED**:    March 6, 2019.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE